**KIRBY McINERNEY LLP**
Karina Kosharskyy (# 029362007)
Ira M. Press
Andrew M. McNeela
825 Third Avenue, 16th Floor
New York, New York, 10022
Tel.: (212) 371-6600

*Counsel for Plaintiff*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARC HIRSCHFELD, <br><br>      Plaintiff, <br><br>   vs. <br><br> MARY C. BECKERLE, D. SCOTT DAVIS, IAN E.L. DAVIS, JENNIFER A. DOUDNA, ALEX GORSKY, MARK B. McCLELLAN, ANNE M. MULCAHY, WILLIAM D. PEREZ, CHARLES PRINCE, A. EUGENE WASHINGTON, RONALD A. WILLIAMS, <br><br>      Defendants, <br><br> and <br><br> JOHNSON & JOHNSON, <br><br>      Nominal Defendant. | Civil Action No.: 18 Civ. _____ <br><br> **COMPLAINT** |

1.      Plaintiff Marc Hirschfeld ("Plaintiff"), who resides at 20 Westover Place, Lawrence, New York, 11559, owns and has continuously owned common stock in the nominal Defendant, Johnson & Johnson ("J&J" or "the Company"), for the last 26 years.  Plaintiff, by his attorneys, brings this Verified Shareholder Derivative Complaint against Johnson & Johnson ("J&J" or the "Company") and the members of its Board of Directors (the "Individual Defendants").  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.  The allegations herein have been informed by an investigation that included, among other things: (a) analysis of the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) review of news articles and other publicly available information; and (c) review and analysis of multiple complaints in civil action filed against Johnson & Johnson.  Plaintiff believes additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery.

## INTRODUCTION

2.      J&J was founded in 1886 and has grown into one of the world's leading health care products and pharmaceutical companies.  The Company manufactures, markets, and sells medical and health care products, including familiar over-the-counter ("OTC") products sold directly to consumers.

3.      Two of J&J's well-known consumer products are body powders named "Johnson's Baby Powder" and "Shower to Shower."  J&J itself has called its iconic Johnson's Baby Powder the "cornerstone of our baby products franchise."

4.      The primary ingredient in J&J's Johnson's Baby Powder and Shower to Shower products is talc.

5.      Since as early as 1971 J&J has been aware of tests which indicated that the talc used in its products contained asbestos or asbestos-like fibers.

6.      Since as early as 1982, J&J has been aware of credible scientific studies which have concluded that a woman's repeated use of talc-based body powders in her genital region significantly increases her risk of developing ovarian cancer.  In fact, in 2006, J&J's talc supplier included a warning with its product which noted that talc is a human carcinogen, according to the World Health Organization.

7.      Moreover, J&J has not disputed that cornstarch is a safe and ready substitute for talc in its Johnson's Baby Powder and Shower to Shower products.  In fact, J&J has been selling a version of its Johnson's Baby Powder that uses cornstarch instead of talc.

8.      Nonetheless, as of this date, J&J continues to sell its talc-based Jonson's Baby Power and Shower to Shower products and denies the presence of any asbestos in those products or that there is any link between perineal talc usage and ovarian cancer.

9.      As further described herein, the Individual Defendants (or their predecessors on the Board) have directly violated their fiduciary obligations by: (i) refusing to place any cancer-related warning on J&J's Baby Powder or Shower to Shower products; (ii) continuing to market such products as safe, and promoting the perineal use of those products by women; (iii) actively lobbying against Federal Drug Administration ("FDA") testing of asbestos levels in cosmetic talc products; (iv) forming a task force within a trade association to which J&J belonged to defend talc usage and undermine studies showing that it posed a public health risk; and (v) terminating research that it initiated and funded if the studies did not support J&J's claim that talc was safe and/or not linked to an increased risk of ovarian cancer.

10. As a direct consequence of the Individual Defendants' bad faith failure to exercise their fiduciary obligations by controlling or preventing the complained of misconduct, the Company has suffered severe injury through the loss of credibility in the marketplace, a damaged reputation, and by being exposed to billions of dollars in liability in individual and class action lawsuits by consumers of J&J's talc-based products. Indeed, as of December 31, 2017, there were approximately 6,610 plaintiffs with pending claims against J&J for injuries allegedly due to J&J's body powders containing talc. And recently, in a case involving 22 women who claimed that they developed ovarian cancer from Johnson's Baby Powder and/or Shower to Shower products, the jury ordered J&J to pay $4.14 *billion* in punitive damages because it determined that J&J had concealed evidence of asbestos in those products.

## JURISDICTION AND VENUE

11. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, because the parties are citizens of different states and the amount in controversy exceeds $ 75,000.

12. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)(2) and (3) and 28 U.S.C. § 1401, because some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred in this District.

## THE PARTIES

**A.    Plaintiff**

13. Plaintiff Marc Hirschfeld lives in Lawrence, New York, which is a village located in Nassau County, Long Island.

14. Mr. Hirschfeld owns and has continuously owned J&J common shares for the past 26 years.

**B.      Nominal Defendant**

15.     Nominal Defendant J&J is a corporation organized under the laws of New Jersey with its principal executive offices and corporate headquarters located in New Brunswick, New Jersey.  J&J manufactures and sells pharmaceutical products, medical devices and consumer packaged goods.

**C.      Individual Defendants**

16.     Defendant Mary C. Beckerle has been a Director since June 2015 and is the chairman of J&J's Science, Technology & Sustainability Committee, and a member of its Regulatory, Compliance & Government Affairs Committee

17.     Defendant D. Scott Davis has been a Director since June 2014 and is the chairman of J&J's Audit Committee and a member of its Compensation & Benefits Committee.

18.     Defendant Ian E. L. Davis has been a director since July 2010 and is a member of J&J's Audit Committee and its Regulatory, Compliance & Government Affairs Committee.

19.     Defendant Jennifer A. Doudna has been a director since April 2018 and is a Member of J&J's Science, Technology & Sustainability Committee.

20.     Defendant Alex Gorsky ("Gorsky") has been J&J's Chief Executive Officer and Chairman of the Board of Directors and since April and December 2012, respectively.

21.     Defendant Mark B. McClellan has been a Director since October 2013 and is a member of J&J's Regulatory, Compliance & Government Affairs Committee and its Science, Technology & Sustainability Committee.

22.     Defendant Anne M. Mulcahy has been the Lead Director since December 2012 and is a member of J&J's Audit Committee, its Nominating & Corporate Governance Committee, and its Finance Committee.

23.     Defendant William D. Perez has been a Director since June 2007 and is the chairman of J&J's Nominating & Corporate Governance Committee, and a member of its Audit Committee.

24.     Defendant Charles Prince has been a Director since February 2006 and is the chairman of J&J's Regulatory, Compliance & Government Affairs Committee, and a member of its Nominating & Corporate Governance Committee.

25.     Defendant A. Eugene Washington has been a Director since November 2012 and is a member of J&J's Compensation & Benefits Committee, and its Science, Technology & Sustainability Committee.

26.     Defendant Ronald A. Williams has been a Director since June 2011 and is the chairman of J&J's Compensation & Benefits committee, and a member of its Nominating & Corporate Governance Committee.

## SUBSTANTIVE ALLEGATIONS

A.     **Description of J&J's Business**

27.     J&J is organized into three business segments: Consumer; Pharmaceutical; and Medical Devices & Diagnostics.

28.     J&J's Consumer segment manufactures, markets and sells premium brand consumer products, used in baby care, oral care, beauty, over-the-counter pharmaceutical, women's health and wound care markets.  Those products include "Johnson's Baby Powder" and "Shower to Shower."

29.     The primary ingredient in Johnson's Baby Powder and Shower to Shower is talc. Talc is an inorganic mineral known as magnesium trisilicate.  The talc used in Johnson's Baby

Powder and Shower to Shower was mined, refined and screened by Imerys Talc America, Inc. ("Imerys Talc"), f/k/a Luzenac America Inc., f/k/a Rio Tinto Minerals, Inc.

30.     At all relevant times, J&J advertised and marketed their "Johnson's Baby Powder" product as the symbol of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" to keep skin dry and comfortable, and "clinically proven to be gentle and mild." J&J induced women through advertisements directing them to use the product "every day to help feel soft, fresh, and comfortable."

31.     At all relevant times, J&J advertised and marketed Shower to Shower as safe for overall body use, as evidenced by its advertisements such as: "Shower to Shower can be used all over your body;" and "Your body perspires in more places than just under your arm.  Use Shower to Shower to feel dry, fresh and comfortable throughout the day."  J&J's website for Shower to Shower promoted use of that product in the genital area, suggesting: "Soothe Your Skin: Sprinkle on problem areas to sooth skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

**B.     The Strong Link Between Perineal Talc Use and Ovarian Cancer**

   **1.     Clinical Evidence Linking Talc Use to Ovarian Cancer**

32.     As early as 1961, research showed that particles similar to talc can migrate from the exterior of women's genital regions to their ovaries.  *See* G.E. Egli & Michael Newton, *The Transport of Carbon Particles in the Human Female Reproductive Tract*, 12 Fertil. & Steril. 151-55 (1961).

33.     Given the mobility of such small particles, researchers remained concerned about the carcinogenic nature of talc.  A 1968 study concluded that "[a]ll the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%.  The fibrous material was predominantly talc but

contained minor amounts of tremolite, anthophyllite, and chrysolite [*i.e.*, asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . .  Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L.J. Cralley et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Indus. Hygiene Ass'n. J. 350-54 (1968).

34.     The first study suggesting a link between talc and ovarian cancer was published in 1971, by Dr. W.J. Henderson and others in Cardiff, Wales.  *See* W.J. Henderson et al., *Talc And Carcinoma of the Ovary and Cervix*, 78 BJOG: An Int'l J. of Obstet. & Gynecol. 266-72 (1971).

35.      In 1982, Dr. Daniel Cramer and others performed the first epidemiologic study on talc powder use in the female genital area (the "Cramer Study").  That study found a significantly increased risk of ovarian cancer in women who reported genital talc use.

36.     Since the publication of the Cramer Study, there have been more than 25 additional epidemiologic studies – ranging in publication date from 1983 through 2016 – providing data regarding the association of talc and ovarian cancer, including at least 19 case-control studies, 1 cohort study, and 1 combined case-control and cohort study.  The vast majority of these studies have reported an elevated risk of ovarian cancer associated with genital talc use.

37.     For example, in 1993, the United States National Toxicology Program ("UNSTP") published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Notably, talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

38.     In 2000, Roberta Ness from the University of Pennsylvania, and others, produced a case-control study of over 2,000 women.  That study found a statistically significant 50% increase in the risk of ovarian cancer from genital talc use.  The study also found that talc causes

inflammation, which contributes to cancer cell development.  *See* Roberta B. Ness et al., *Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer*, 11 Epidemiology 111-17 (2000).

39.     A prospective cohort study also published in 2000 and considered to be the most informative study to date, found a 40% increase in invasive cancers in women who applied talcum powder to their perineum.  Dorota M. Gertig et al., *Prospective Study of Talc Use and Ovarian Cancer*, 92 JNCL: J. of the Nat'l. Cancer Inst. 249-52 (2000).

40.     In June 2013, a pooled analysis of over 18,000 women in eight case-control studies found a 20% to 30% risk of women developing epithelial ovarian cancer from genital powder use. The study concluded that, "[b]ecause there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." K.L. Terry et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls*, 6 Cancer Prevention Research 811-21 (2013).

41.     And recently, a May 2016 study of African-American women found that talc-based body powder was associated with epithelial ovarian cancer and constituted a significant modifiable risk factor among that population.  *See* J.M. Schildkraut et al., *Association between Body Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study*, 25 Cancer Epid., Bio. Prev. 1411-17 (2016).

42.     In addition to the numerous case control studies published over the last several decades, there have been several meta-analyses that also found a significant positive association between the use of talcum powder in the genital area and ovarian cancer.

43.     For example, in 1992, the National Cancer Institute sponsored a meta-analysis conducted by Bernard Harlow and Daniel Cramer from Harvard Medical School at Brigham and

Women's Hospital.  The study found that "a lifetime pattern of talc use may increase the risk for the epithelial ovarian cancer," and that "[g]iven the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly as a daily habit."  B.L. Harlow et al., *Perineal Exposure to Talc and Ovarian Cancer Risk*, 80 Obstet. & Gynecol. 19-26 (1992).

44.     And most recently, in May 2015, Roberta Ness performed a meta-analysis of all accumulated epidemiological evidence including 23 case-control studies, 5 meta-analyses, and 2 analyses of a single cohort.  Talc use was found to increase cancer by 30-60% in almost all well-designed studies.  Roberta B. Ness, *Does Talc Exposure Cause Ovarian Cancer?*, 25 Int'l. J. of Gynecol. Cancer 51 (2015).

**2.     Governmental and NGO Recognition of the Link Between Talc and Serious Health Consequences, Including Ovarian Cancer**

45.     In addition to these studies, various governmental and non-governmental organizations have addressed and/or warned of the adverse health consequence of talc usage in women.

46.     Upon information and belief, in or about 1990, the U.S. Food and Drug Administration ("FDA") asked manufacturers of surgical gloves to stop putting talc in their products due to mounting scientific evidence showing that talc caused adhesions in surgical patients, which is an indication of a foreign body reaction. And on December 19, 2016, the FDA formally issued a ban on powdered surgical gloves, stating that "the risk of illness of injury posted by powdered gloves is unreasonable and substantial."  Banned Devices; Powdered Surgeon's Gloves, Powdered Patient Examination Gloves, and Absorbable Powder for Lubricating a Surgeon's Glove, 81 Fed. Reg. 91722-01, 91723 (Dec. 19, 2016).

47.     Upon information and belief, in or about 1996 and at the request of the FDA, the condom industry stopped dusting condoms with talc due to growing health concerns.

48.     In 2005, the Fifth Edition of "Myths & Facts About Ovarian Cancer.  What You Need to Know," was published by Steven Piver, M.D. and Gama Eltabbakh, M.D.  The publication was partly sponsored by Glaxo Smith Kline.  At the time of publication, Dr. Piver was the Chair Emeritus of the Department of Gynecologic Oncology, and Founder and Director of the Gilda Radner Familial Ovarian Cancer Registry at the Roswell Park Cancer Institute in Buffalo, New York.  Dr. Eltabbakh was a tenured professor of obstetrics and gynecology and the Director of the Division of Gynecologic Oncology at the University of Vermont.  The section of the pamphlet entitled "What Causes Ovarian Cancer?" lists, among other things, "Use of Talc (Baby Powder) in the Genital Area" as a risk factor.

49.     In or about 2006, the Canadian Government, under the Hazardous Products Act and related Controlled Products Regulations, classified talc as a "D2A," "very toxic," "cancer causing substance" under its Workplace Hazardous Materials Information System.  Asbestos is also classified as a "D2A" substance.

50.     In 2008, the Cancer Prevention Coalition submitted a petition to the FDA "Seeking a Cancer Warning on Cosmetic Talc Products."  The petition requested that the FDA immediately require cosmetic talcum powder products to bear a prominent warning that frequent perineal talc application increased the risk of ovarian cancer.

51.     In or about February 2010, the International Association for the Research of Cancer ("IARC"), which is an agency within the World Health Organization, published a paper in which it classified perineal use of talc-based body powder as a "Group 2B" human carcinogen.  The IARC, which is a recognized international authority on the carcinogenicity of chemical substances, noted that studies from around the world had consistently found an increased risk of about 30-60% for ovarian cancer in women who used talc on their perinea.  Specifically, the IARC reported that

"[t]here is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition, "[l]imited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible."

52.     As of today, both the National Cancer Institute and American Cancer Society list genital talc use as a risk factor for ovarian cancer.

**C.     J&J Knew that its Talc-Products Posed Severe Heath Risks, but Declined to Warn Consumers and Actively Sought to Undermine Disclosure of those Risks**

53.     Notwithstanding the numerous public studies and reports detailed above of which J&J was undoubtedly aware (*see* ¶¶ 32-52), there is overwhelming direct evidence of J&J's knowledge of possible increased risk of ovarian cancer caused by genital talc use.

54.     A January 16, 2018 *FairWarning* article entitled "Baby Powder Battles:  Johnson & Johnson Internal Documents Reveal Asbestos Worries" reported that around the same time that J&J was publicly claiming in June 1971 that there "is no asbestos contained in" its Baby Powder, an internal J&J memorandum recommended that it was "more than appropriate that we upgrade the quality control on our talc and baby powder, particularly as to the potential asbestos content."

55.     A February 7, 2018 press release issued by the law firm Beasley Allen (the "Beasley Press Release") stated that internal J&J documents from 1972 "note that asbestos was found in 100 percent of talc samples tested at the time."

56.     According to a September 21, 2017 *Bloomberg* article entitled "Johnson & Johnson Alerted to Risk of Asbestos in Talc in '70s, Files Show," internal J&J documents disclosed during litigation reveal that J&J was alerted to traces of possible asbestos fibers in the talc produced at its mine in Windsor, Vermont as early as 1973.

57.     Specifically, the *Bloomberg* article recounted that an internal Company memorandum about J&J's Windsor talc mine from 1973 noted that J&J was "working with federal officials to check for fibers that could indicate the presence of asbestos at the site."  That memorandum further noted that, according to a J&J official, the Company's baby powder "'contains talc fragments classifiable as fiber,'" and that there occasionally are "'sub-trace quantities of' two types of asbestos that 'might be classified as asbestos fiber.'"  As a consequence, another J&J official, concerned that asbestos may have tainted J&J's talc products, suggested that the company use cornstarch instead.

58.     That *Bloomberg* article also referenced a May 1974 memo prepared J&J's director of research and development at its Windsor mine, which recommended that the Company institute certain processes to counteract the presence of asbestos in the talc it mined.  Specifically, the director wrote that "[t]he use of these systems is strongly urged by this writer to provide protection against what are currently considered to be materials presenting a severe health hazard and are potentially present in all talc ores in use at this time."

59.     Finally, that *Bloomberg* article noted that after J&J acquired a talc mine in Turin, Italy, it "pushed to stop the distribution of a booklet" that the mine's owners had produced in 1974, which "reveal[ed] the discovery of trace amounts of asbestos in the talc."  According to a J&J research scientist, the booklet posed a "business threat," because "'it can raise doubts on the validity of the documentation of purity and safety of talc.'"

60.     J&J also successfully lobbied the Food and Drug Administration ("FDA") in 1974 not to regulate cosmetic talc use.  According to the *FairWarning* article, "J&J and its allies successfully pushed for a relatively permissive test protocol," and ultimately convinced the FDA to let the cosmetics industry do its own testing via the Cosmetics, Toiletries and Fragrance

Association (since renamed the Personal Care Products Council), of which J&J and Imerys Talc were members.  In that connection, J&J sent a letter to Dr. Robert Schaffner, a senior FDA official, arguing that talc powders that were 1% asbestos did not pose a health risk to babies, and therefore "methods capable of determining less than 1% asbestos in talc are not necessary to assure the safety of cosmetic talc."

61.    As further recounted by the *FairWarning* article, the FDA accepted the industry's proposed test method in 1976, but imposed a detection limit of 0.5% asbestos, a level which "many experts say . . . does not assure that potentially hazardous levels of asbestos will be detected."

62.    In 1982, shortly after the Cramer Study was published Dr. Bruce Semple of J&J personally visited Dr. Cramer to discuss his findings that women who applied talcum powder to their genital region daily were three times more likely contract ovarian cancer.  Dr. Cramer advised Dr. Semple that J&J should place a warning on its talcum powder products regarding the ovarian cancer risk.

63.    And, in an August 12, 1982 New York Times Article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," J&J admitted that it was aware of the Cramer Study.

64.    In response to the USNTP's 1993 study linking talc use with ovarian cancer – even in the absence of any asbestos fibers – the Cosmetic Toiletry and Fragrance Association ("CTFA") formed the Talc Interested Party Task Force ("TPITF").  J&J, as well as its talc supplier Imerys Talc (d/b/a Luzenac at that time), were members of the CTFA and the TPITF's primary contributors.  The TIPTF's purpose was to pool its members financial resources to collectively defend talc use and to prevent regulation of the talc industry.

65.    On November 10, 1994, the Cancer Prevention Coalition mailed a letter to Ralph Larson, J&J's Chief Executive Officer at that time, informing the Company that studies as far back

as 1960's "show[ ] conclusively that the frequent use of talcum powder in the genital area pose a serious health risk of ovarian cancer."  The letter quoted a recent study by Dr. Bernard Harlow from Harvard Medical School, which confirmed this risk and discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Johnson & Johnson withdraw talc products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk that they pose.

66.     Further, according to the Beasley Press Release, a September 1997 letter authored by Alfred Wehner, a toxicology expert hired by J&J, informed the Company that at least 9 studies had shown a statistically significant ovarian cancer risk for woman who apply talc products to their genital regions.

67.     Mr. Wehner's letter also stated that, on three separate occasions, the TIPTF released false information to the public about the safety of talc.  Mr. Wehner further warned J&J that its response to the cancer threat could cause a public opinion backlash similar to the one the tobacco industry faced when they denied cigarettes cause lung cancer.

68.     In 2001, an Imerys Talc executive stated in an email to the FDA that the cosmetic industry's self-imposed tests for detecting asbestos "are simply not sensitive enough to provide complete assurance that the talc is free of detectable asbestos."

69.     In 2006, Imerys Talc began placing a warning on its Material Safety Data Sheets ("MSDS") for the talc it provided to J&J and its other clients. That warning included the WHO/IARC's designation of talc-based body powder as a "Group 2B" human carcinogen, as well as the Canadian Government's "D2A" classification of talc as a "very toxic," "cancer causing

substance." Upon information and belief, J&J did not elect to include that same information on its products that used talc from Imerys Talc.

70.     In February 2016, J&J was forced to concede to California regulators that the talc in its Baby Powder can lead to an increased risk of ovarian cancer. Specifically, in 2005, the State of California passed the California Safe Cosmetics Act, which requires cosmetics manufactures to disclose to the California Department of Public Health ("CDPH") all products containing chemicals known or suspected to cause cancer birth defects, or other reproductive toxicity. The CDPH lists "talc-based body powders (perineal use of)" to their list of ingredients known or suspected to cause cancer, requiring registration. J&J, however, did not register its Baby Powder with the CDPH until the beginning of 2016, when it acknowledged that the IARC considers "use of talc or talc-based powder in the perineal (genital) area to be a possible human carcinogen."

71.     In May 2017 J&J stopped funding an Israeli researcher that it had hired to test talc samples for asbestos contamination, when he reported that the majority of the samples he analyzed tested positive for asbestos.

72.     Several of the Individual Defendants were further aware of the increased cancer risk associated with their talc-based body powders, owing to their positions on J&J's Regulator, Compliance and Government Affairs Committee and/or the Science, Technology and Sustainability Committee.

73.     Messrs. Prince and Ian Davis, and doctors McClellan and Beckerle have been and continue to be members of J&J's Regulator, Compliance and Government Affairs Committee. The purpose of this committee is to provide oversight of regulatory, compliance, quality and governmental matters that may impact the Company including product quality, safety and compliance.

74.     Doctors Beckerle, Doudna, McClellan and Washington have been and continue to be members of J&J's Science, Technology and Sustainability Committee.  The purpose of the committee is to provide general oversight of the scientific and technological aspects of the Company's business, including the scientific and technological aspects of product safety matters and public health trends that may impact the Company's business.

**D.     J&J has Repeatedly Denied the Health Hazards of its Talc-Based Products**

75.     Throughout the past few decades, J&J has claimed that its talc-based products pose no health risks to its consumers.  The purported assurances have continued in recent years despite the ever-mounting and convincing evidence to the contrary.

76.     On May 12, 2014, J&J issued the following statement in an article published by *Fox 32*, titled "Popular Baby Powder Allegedly Caused Cancer in Pro-Figure Skater":

> "We have no higher responsibility than the health and safety of consumers who rely on our products. It is important for consumers to know that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies."

77.     On December 30, 2016, J&J touted the safety and effectiveness of talc in its products on its website at https://www.safetyandcarecommitment.com/Ingredients/Talc, stating in pertinent part:

> **In our products**
>
> We continue to use talc in our products because decades of science have reaffirmed its safety. Because of its safety and effectiveness, we confidently include pharmaceutical grade talc in our products. Your trust in our products and your confidence using them every day is a huge responsibility—that's why we only use ingredients in our products deemed safe by the latest science.
>
> Science, research, clinical evidence and 30 years of studies by medical experts around the world continue to support the safety of cosmetic talc.

78.     On July 1, 2017, J&J touted the safety and effectiveness of talc in its products on its website at https://www.johnsonsbaby.com.ph/baby-products/johnsons-baby-powder, stating in pertinent part:

> **Is talc safe for my baby's skin?**
>
> JOHNSON'S® Baby talc products are made using U.S. Pharmacopeial (USP) grade talc to ensure it meets the highest-quality, purity and compliance standards. Our talc is carefully selected, processed and tested to ensure that [it] is asbestos free, as confirmed by regular testing conducted since the 1970s.
>
> Our confidence in using talc is based on a long history of safe use and more than 30 years of research by independent researchers, scientific review boards and global regulatory authorities.
>
> Read more about our Safety & Care Commitment here: http://www.safetyandcarecommitment.com/ingredient-info/other/talc

79.     On September 21, 2017, Ernie Knewitz, a spokesman for J&J, said in an emailed statement to *Bloomberg* that:

> "We are confident that our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation," Knewitz said. "Historical testing of samples by the FDA, numerous independent laboratories, and numerous independent scientists have all confirmed the absence of asbestos in our talc products."

80.     On November 16, 2017, *Reuters* published an article titled, "Johnson & Johnson Wins California Lawsuit Claiming Asbestos in Talc Caused Cancer," wherein J&J was quoted stating that "Johnson's Baby Powder has been around since 1894 and it does not contain asbestos or cause mesothelioma or ovarian cancer."

**E.    J&J has Incurred, and Continues to Face, Massive Liability for its Failure to Warn Consumers of the Risks Associated with its Talc-Based Products**

81.     In recent years, the cancer risk associated with J&J's talc-based body powders materialized and resulted in thousands of women filing lawsuits against J&J claiming that they

developed ovarian cancer from using J&J's Baby Powder or Shower to Shower products. Indeed, as of December 31, 2017, there were approximately 6,610 plaintiffs with such actions pending against J&J.

82.    One such action was filed by 22 women (or their estates) in Circuit Court in St. Louis, Missouri in 2015, under the caption *Ingham v. Johnson & Johnson et al.* (the "*Ingham* Action").

83.    On July 12, 2018, the jury in the *Ingham* Action returned verdicts in the plaintiffs' favor, which included substantial compensatory damages and a staggering $4.14 billion combined punitive damages award against J&J and its subsidiary J&J Consumer. The verdict form indicated that the punitive damages award was for "aggravating circumstances."

84.    Prior to returning that verdict, the Judge in the *Ingham* Action instructed the jury that in order to award punitive damages, they would need to conclude that J&J's conduct showed "complete indifference to or conscious disregard for the safety of others."

85.    A *Law 360* article reported that, during the punitive damages phase of closing arguments, the *Ingham* Plaintiffs' attorney stressed that a punitive damages award was appropriate because "the evidence was there that J&J had covered up testing data and scientific studies that it knew showed the cosmetic-grade talc in Johnson's Baby Powder and Shower to Shower contained asbestos."

86.    According to a July 13, 2018 *BusinessReport* article entitled "Johnson & Jonson jury awards $4.14bn punitive damages over talc cancer," the *Ingham* Plaintiffs' attorney stressed to jurors that J&J "knew its talc products were contaminated with asbestos and kept this information from reaching the public," and that J&J "'rigged' tests to avoid showing the presence

of asbestos," and "if a test showed the presence of asbestos, J&J sent it to a lab the company knew would produce different results."

87.    In discussing the punitive damages award, a July 24, 2018 *PR Newswire* article entitled "Jury Orders J&J to pay 4.7 Billion for Baby Powder Contaminated with Asbestos" reported that "the six men and six women jury unanimously agreed that J&J hid evidence of the potential harm that could be caused by their products."

88.    In a July 13, 2018 *St. Louis Today* article entitled "Talc cancer verdict of $4.6 billion from St. Louis jury sends 'very powerful message,'"  an *Ingham* juror explained that the jury arrived at the punitive damages award by multiplying "the roughly $70 million Johnson & Johnson earned selling baby powder in a recent year by the 43 years … since the company claimed baby powder did not contain asbestos."  The juror added that the jury was "just trying to find something [the Company] would feel."

89.    In the wake of the *Ingham* verdict, legal experts have marveled at the size of the award and commented on the serious threat J&J continues to face in litigating these cases.  For example, CBS News legal expert, Rikki Kliemann, stated that the *Ingham* verdict represented "one of the most extraordinary amounts of money in punitive damages," and Jean Eggen, a Wilder University law professor who teaches about mass torts, forewarned that "[t]his was a new theory and the jury lined up behind it," and that it "may be a harbinger of things to come."

90.    Five days after the *Ingham* punitive damages award, Gorsky made clear during J&J's July 17, 2018 Second Quarter Earnings Call that the Company was undeterred and unrepentant. He vowed that the Company would fight the *Ingham* verdict and continued to deny that J&J's talc products contain asbestos or present any health risks.

### F.      The Individual Defendants' Duties and Obligations

91.      At all relevant times, the Individual Defendants, by virtue of their status as directors of the Company and/or through their ability to control the business and corporate affairs of the Company, including its wholly owned subsidiary J&J Consumer Inc.: (i) owed the Company and its stockholders the highest fiduciary obligations of fidelity, trust, loyalty and due care; and (ii) were and are required to control and operate the Company in a fair, just and equitable manner, to exercise due care and diligence in the management and administration of the Company's affairs and in the use and preservation of its property and assets, and to act in furtherance of its best interests.

92.      Each Individual Defendant also owed to the Company and its shareholders a duty to refrain from acts of intentional misconduct.

93.      To discharge these duties, each Individual Defendant was required to act lawfully in conducting the business of the Company, speak truthfully about the Company's products, act with the utmost integrity with respect to the dissemination of information about the Company's products, and to avoid committing acts of waste of corporate assets, mismanagement and gross negligence.

94.      Furthermore, each Individual Defendant's fiduciary obligations required him or her to exercise reasonable and prudent supervision over the management, policies, controls and financial affairs of the Company and its subsidiaries; to exercise reasonable control and supervision over the officers, employees, and agents of the Company and its subsidiaries, including by assuring that corporate officials were not making false statements and were not engaging in corporate waste or mismanagement; to remain informed as to the true condition of the Company's affairs and prospects, including the nature and effects of the Company's major products, and the

conduct and integrity of management and, upon receiving notice or information of a wrongful and unsound decision, condition or practice, to make a reasonable investigation in connection therewith and to take steps to correct that decision, condition or practice.

95.     The Individual Defendants breached their fiduciary duties by, among other things:

a.     failing to supervise adequately the operations of the Company and its subsidiaries as to void waste of corporate assets including, but not limited to making false statements, some of which were the subject of a federal securities fraud class action lawsuit entitled *Hall v. Johnson & Johnson et al.*, No. 18 Civ. 1833 (D.N.J. 2018); and

b.     knowing, or recklessly failing to know, of mismanagement and/or waste of corporate assets and other misconduct, including the making of false statement, and failing to take steps in a timely manner to prevent such misconduct.

96.     As a direct result of misconduct, waste of corporate assets, and the violation of their fiduciary duties to the Company, each Individual Defendant has contributed to significant damage to the Company.  The reputation of the Company has been seriously damaged, and its management has lost credibility with the public, all of which severely jeopardized the Company's prospects. The Company also faces staggering liability and substantial costs in connection with pending actions brought by consumers of the Company's talc-based body powders.  Furthermore, these lawsuits will also cost the Company substantial amounts in manpower, expenses, legal and other fees, and incidental costs, as well as diverting its personnel from the Company's core operations.

**G.     Derivative Allegations**

97.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered by the Company as a direct result of the wrongful conduct of the Individual Defendants herein.

98.     Plaintiff will fairly and adequately represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

**H.      Demand on J&J's Board is Futile**

99.     Plaintiff has not made a demand on the Board of Directors of the Company to file a suit asserting the claims specified herein.  Such a demand would be futile and useless for at least the following reasons.

100.    All the current members of the Company's Board are among the named Individual Defendants herein and have been, or but for their recklessness would have been, aware of the wrongs forming the basis for the claims alleged herein for many years.

101.    Indeed, the misconduct giving rise to this case as detailed above is not the result of a few bad apples or rogue employees.  Rather, J&J's Board was repeatedly informed, over a period of decades, of the presence of asbestos in its talc-based products, as well as numerous, independent studies and other sources demonstrating the increased risk of ovarian cancer in women who use talc-based products, such as Johnson's Baby Powder and Shower to Shower, in their genital area – a usage the Company actively cultivated and continues to cultivate.

102.    Furthermore, pursuant to J&J's Principles of Corporate Governance, all of the Company's Directors were "well supported by accurate and timely information" and were provided with "sufficient time and resources" to fully attend to all of their crucial oversight responsibilities.  Additionally, Directors have "unrestricted . . . full and free access to officers and employees of the Company."

103.    Nevertheless, the Individual Defendants have failed to protect the Company and even today are repeating the false statements they or their predecessors have made denying the

health risks for women from using the Company's talc-based body powders, including Johnson's

Baby Powder and Shower to Shower, in their genital areas, despite clear evidence to the contrary.

104.    Accordingly, the current members of the Company's Board have participated in,

acquiesced in, or approved the wrongs alleged herein, and did so in direct violation of their duties

to the duties to the Company and its shareholders.  They, therefore, participated in a long-term and

continuing course of corporate misconduct, mismanagement, and waste.  Because of their

involvement in the alleged wrongs, the Individual Defendants suffer an irreconcilable conflict of

interest regarding the prosecution of this action and cannot exercise the requisite independence

necessary to make good faith business judgements.  This irreconcilable conflict of interest and lack

of independence extends also to the Individual Defendants' ability to pursue any actions against

the former officers and directors of the Company.

105.    Moreover, Gorsky, the Company's CEO and Chairman of the Board has been sued

individually in the *Hill* action for violations of § 10(b) of the Securities Exchange Act, for making

false statements in connection with the ovarian cancer risks of J&J's Baby Powder and Shower to

Shower products.  As such, Gorsky has an irreconcilable conflict of interest regarding the

prosecution of this action, which could likely lead to the discovery of evidence subjecting him to

personal liability in the *Hill* action.

106.    Because of the severe damage done to the Company by the misconduct alleged

herein, the Company has already been subjected to litigation and massive punitive damages

awards.  As such, it is unlikely that the Board would voluntarily bring suit against those who

committed such misconduct for fear of admitting wrongdoing in such litigations.  Indeed, Gorsky

recently vowed that the Company would continue to deny all wrongdoing and fight all pending

actions alleging that perineal use of Johnson's Baby Powder or Shower to Shower products caused ovarian cancer.

107.     The members of the Company's Board further cannot be expected to exercise independent judgment in deciding whether they should voluntarily bring suit based on the misconduct alleged herein, because the *Ingham* jury has concluded that J&J, under the stewardship of the Individual Defendants and their predecessors, intentionally schemed to conceal the fact that its talc-based body powders contained asbestos, which resulted in numerous women developing ovarian cancer.  Indeed, it is this ongoing deceit that formed the basis for the *Ingham* jury hitting J&J with one of the largest punitive damage awards in history.  And because the Individual Defendants continue to perpetrate their scheme to this day, any demand for an investigation of their own wrongful actions would be futile.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

108.     Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

109.     As directors of a New Jersey corporation, each of the Director Defendants owed and owes fiduciary duties to J&J and its shareholders.  Moreover, as members of the Board, these defendants had specific fiduciary duties as defined by the Company's key corporate governance documents and principles.  Pursuant to these duties, the Director Defendants specifically owed and owe J&J the highest obligation of good faith and loyalty in the administration of the affairs of the Company, and the obligation to take timely and good faith remedial actions to correct misconduct.

110.    Consistent with these duties, the Director Defendants were obligated to educate themselves about the safety of the products they manufactured and sold and to speak honestly and in good faith on such matters.

111.    Each of the Director Defendants consciously violated these duties. As members of the Board, they were each warned, specifically and repeatedly, over a number of years, about the presence of asbestos in their talc-based body powders and the strong evidence linking the perineal use of such products with ovarian cancer.  Moreover, several of the Individual Defendants served on committees that, as previously described, gave them direct responsibility for, and detailed information concerning, the health and safety issues alleged herein.

112.    Faced with this credible and cumulative information/red flags, the Individual Defendants had a duty to act in good faith and not knowingly violate the law by, among other things, investigating the issues raised, ensuring that the Company was taking appropriate remedial actions, and overseeing those remedial measures to ensure their effectiveness.

113.    The Individual Defendants consciously violated their corporate responsibilities and fiduciary duties by affirmatively and repeatedly: (i) declining to stop selling talc-based body powders; (ii) falsely claiming that their talc-based body powders did not contain asbestos; (iii) falsely claiming that J&J's talc based body powders were safe to use and were not shown to increase the risk of ovarian cancer; and (iv) declining to include any warnings on its Johnson's Baby Powder or Shower to Shower products regarding the presence of asbestos or the risk of ovarian cancer.

114.    As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, the Company has sustained and will sustain significant

damages, not only monetarily, but also to its corporate image and goodwill in an amount that is not presently determinable, but in excess of $75,000.

115.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

i.    Determining that this action is a proper derivative action maintainable under law and demand is excused.

ii.    Declaring that the current and former directors and officers named as defendants herein have breached their fiduciary duties as alleged herein;

iii.    Requiring the defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

iv.    Directing J&J to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein.

v.    Awarding plaintiffs and their counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

vi.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all triable issues.

Dated: October 9, 2018

**KIRBY McINERNEY LLP**

Karina Kosharskyy (# 029362007)
Ira M. Press
Andrew M. McNeela
825 Third Avenue, 16th Floor
New York, New York, 10022
Tel.: (212) 371-6600

*Counsel for Plaintiff*

28

## VERIFICATION

I, Marc Hirschfeld, hereby verify that I: (i) currently own shares of Johnson & Johnson common stock and that I have been a Johnson & Johnson shareholder continuously for the past 26 years; (ii) will continue to hold Johnson & Johnson shares throughout the litigation; (iii) have reviewed the foregoing shareholder derivative Complaint on behalf of Nominal Defendant Johnson & Johnson, and know that the allegations concerning me are true and correct, and believe that all other allegations are true and correct based on information and belief and reliance on my counsel and their investigation; and (iv) have authorized the filing of the foregoing Complaint.

Dated: October 7, 2018

_____

(Signature of Marc Hirschfeld)

SWORN TO AND SUBRIBED before me this 7th day of October, 2018

_____

Notary Public

My Commission Expires: 5/27/22

SHAYE FUCHS
Notary Public, State of New York
No. 02FU6304372
Qualified in Nassau County
My Commission Expires 05-27-2018
22