Keith J. Miller, Esq.
ROBINSON MILLER LLC
One Newark Center
Newark, New Jersey 07102
(973) 690-5400
kmiller@rwmlegal.com

Walter C. Carlson (admitted *pro hac vice*)
Kristen R. Seeger (admitted *pro hac vice*)
Christopher Y. Lee (admitted *pro hac vice*)
A. Michaela Kabat (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for Nominal Defendant*
*Johnson & Johnson*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARC HIRSCHFELD,<br><br>                    Plaintiff,<br><br>        vs.<br><br>MARY C. BECKERLE, D. SCOTT DAVIS, IAN E.L. DAVIS, JENNIFER A. DOUDNA, ALEX GORSKY, MARK B. McCLELLAN, ANNE M. MULCAHY, WILLIAM D. PEREZ, CHARLES PRINCE, A. EUGENE WASHINGTON, RONALD A. WILLIAMS,<br><br>                    Defendants,<br><br>        and<br><br>JOHNSON & JOHNSON,<br><br>                    Nominal Defendant. | CIVIL NO.  3:18-cv-14796 (FLW)<br><br>**JOHNSON & JOHNSON'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>ORAL ARGUMENT REQUESTED |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................**Error! Bookmark not defined.**

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

PLAINTIFF'S ALLEGATIONS ................................................................................................6

PROCEDURAL BACKGROUND .............................................................................................8

ARGUMENT ..............................................................................................................................9

I.      THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILED TO
        MAKE A DEMAND, AS REQUIRED UNDER NEW JERSEY LAW. .......................10

        A.      In 2018, New Jersey Made Its Statutory Demand Requirement Mandatory, Unless A
                Corporation Opts Out, Which J&J Has Not Done. ...........................................10

        B.      The Statutory Demand Requirement Is Substantive And Overrides The Procedural
                Demand-Futility Exception That Courts Previously Recognized. .......................13

II.     THE COMPLAINT ALSO FAILS TO MEET THE PRIOR DEMAND FUTILITY
        STANDARD. ...............................................................................................................14

        A.      Plaintiff Must Plead With Particularity That A Majority Of The Directors Are Interested.
                ..........................................................................................................................15

        B.      Plaintiff Also Must Plead With Particularity That A Majority Of The Directors
                Knowingly Acted Against The Interests Of The Company Or Knowingly Violated
                The Law. ...........................................................................................................17

        C.      The Alleged Red Flags Do Not Establish A Substantial Likelihood Of Liability. .............19

                1.      Plaintiff Does Not Allege That Any Purported "Red Flags" Were
                        Communicated To The Board. ................................................................20

                2.      Plaintiff Misrepresents The Research On Perineal Talc Usage Cited In The
                        Complaint And The Need For Any Talc-Product Warning. .....................22

        D.      The Existence Of Litigation Does Not Establish A Substantial Likelihood Of   Liability.
                ..........................................................................................................................24

        E.      The Directors' Service On Board Committees Does Not Establish A Substantial
                Likelihood Of Liability. ....................................................................................25

III.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE BECAUSE
        AMENDMENT WOULD BE FUTILE. ........................................................................26

CONCLUSION ........................................................................................................................27

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                             **Page(s)**

*Allen ex rel. Allen & Brock Constr. Co., Inc. v. Ferrera*,
    540 S.E.2d 761 (N.C. Ct. App. 2000) ................................................................. 11

*Brod v. Sioux Honey Ass'n Coop.*,
    609 F. App'x 415 (9th Cir. 2015) ....................................................................... 7

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ............................................................................. 7

*In re Caremark Int'l Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996) ............................................................... 17, 18, 22

*Carl v. Johnson & Johnson*,
    2016 WL 4580145 (N.J. Super Ct. Law Div. Sept. 2, 2016) ............................. 25

*In re Chemed Corp., S'holder Deriv. Litig.*,
    2015 WL 9460118 (D. Del. Dec. 23, 2015) ...................................................... 26

*Coordinated v. Johnson & Johnson*,
    No. BC628228, 2017 Cal. Super. LEXIS 8757 (Nov. 17, 2017) ....................... 25

*Dunn v. Ceccarelli*,
    489 S.E.2d 563 (Ga. Ct. App. 1997) ................................................................. 11

*Fagin v. Gilmartin*,
    432 F.3d 276 (3d Cir. 2005) ............................................................................. 17

*Freedman v. Redstone*,
    753 F.3d 416 (3d Cir. 2014) ............................................................................. 10

*In re Intel Corp. Deriv. Litig.*,
    621 F. Supp. 2d 165 (D. Del. 2009) .................................................................. 21

*In re Johnson & Johnson Deriv. Litig.*,
    865 F. Supp. 2d 545 (D.N.J. 2011) ..........................................................*passim*

*Johnson v. Glassman*,
    950 A.2d 215 (N.J. Super. Ct. App. Div. 2008) ................................................ 17

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ............................................................................. 10, 11, 14

*Kanter v. Barella*,
    388 F. Supp. 2d 474 (D.N.J. 2005) ................................................................... 18

*Kanter v. Barella*,
    489 F.3d 170 (3d Cir. 2007) ................................................................................. 16

*McCann v. McCann*,
    61 P.3d 585 (Idaho 2002) ............................................................................. 11, 14

*In re Merck & Co., Inc. Deriv. & ERISA Litig.*,
    2006 WL 1228595 (D.N.J. May 5, 2006) ...................................................... 15, 18

*In re Merck & Co., Inc. Sec., Deriv. & "Erisa" Litig.*,
    2008 WL 2788400 (D.N.J. June 17, 2008) .......................................................... 20

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,
    493 F.3d 393 (3d Cir. 2007) ................................................................. 10, 18, 19

*In re Midlantic Corp. S'holder Litig.*,
    758 F. Supp. 226 (D.N.J. 1990) ......................................................................... 13

*Murashko v. Hammer*,
    2018 WL 1022575 (D.N.J. Feb. 22, 2018) .......................................................... 13

*Ark. Teacher Ret. Sys. ex rel. Progress Software Corp. v. Alsop*,
    2007 WL 7069609 (D. Mass. Sept. 22, 2007) ..................................................... 11

*In re Prudential Ins. Co. Deriv. Litig.*,
    659 A.2d 961 (N.J. Super. Ct. Ch. Div. 1995) ............................................... 15, 16

*In re PSE&G S'holder Litig.*,
    801 A.2d 295 (N.J. 2002) ............................................................ 13, 14, 15, 16

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ............................................................................. 15, 16

*Richardson v. Ulsh*,
    2007 WL 2713050 (D.N.J. Sept. 13, 2007) ........................................................ 15

*Henry et al. v. Johnson & Johnson et al.*,
    Case No. L-1748-17 (N.J. Super. Ct., Oct. 11, 2018) ........................................ 25

*SEC. Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ................................................................................. 4

*Speetjens v. Malaco Inc.*,
    929 So. 2d 303 (Miss. 2006) .............................................................................. 11

*State ex rel. Y.S.*, 934 A.2d 1140, 1144 (N.J. Super. Ct. Ch. Div. 2007) ................... 14

*Tully v. Mirz*,
    198 A.3d 295 (N.J. Super. Ct. App. Div. 2018) ................................................ 12

*Vanderklok v. United States*,
    868 F.3d 189 (3d Cir. 2017) ..................................................................... 21

*Wood v. Baum*,
    953 A.2d 136 (Del. 2008) ......................................................................... 18

*Zomolosky v. Kullman*,
    640 F. App'x 212 (3d Cir. 2016) ................................................ 17, 19, 26

*Zomolosky v. Kullman*,
    70 F. Supp. 3d 595 (D. Del. 2014) ........................................................... 13

**Statutes**

N.J.S.A. 14A:2-7(3) ....................................................................................... 18

N.J.S.A. 14A:3-6.3 .................................................................................. *passim*

N.J.S.A. 14A:3-6.9 .................................................................................. *passim*

N.J.S.A. 14A:6-1 ........................................................................................... 10

**Other Authorities**

American Bar Association's Model Business Corporation Act .................... 11

Fed. R. Civ. P. 23.1 ....................................................................... 13, 14, 15

Fed. R. Evid. 201 .......................................................................................... 4, 7

N.J. R. Ct. 4:32-3 ................................................................................... 13, 14

N.J. R. Ct. 4:32-5 .......................................................................................... 13

Nominal defendant Johnson & Johnson ("J&J" or the "Company") respectfully submits this brief in support of its motion to dismiss the Complaint ("Complaint" or "Compl.").

## INTRODUCTION

Plaintiff Marc Hirschfeld is a shareholder in J&J, which is a global healthcare company headquartered in New Brunswick, New Jersey. This is a shareholder derivative action in which Plaintiff seeks to bring a lawsuit on behalf of J&J against the Company's directors (the "Director Defendants"). Plaintiff has no individual injury or cause of action. Instead, the Complaint alleges that J&J has been harmed by its directors and purports to assert legal claims that belong to J&J. The Director Defendants are the eleven members of J&J's Board of Directors at the time this lawsuit was filed.

Plaintiff asserts that the Director Defendants have breached their fiduciary duties by allowing J&J to continue to sell talc-based body powders, in the form of Johnson's Baby Powder and former J&J product Shower to Shower, despite research that allegedly indicates that perineal talc application causes ovarian cancer and tests that allegedly indicate J&J's talc contained asbestos or asbestos-like fibers. (Compl. ¶¶ 5–9.) Although Plaintiff purports to act on behalf of J&J, the Complaint essentially parrots the allegations made by other plaintiffs in the underlying talc products liability litigation and related matters. Plaintiff thus ignores the history of independent testing of J&J's talc (which the Company has made public at www.factsabouttalc.com), fails to acknowledge J&J's success both in defending underlying litigation and on appeal, and misrepresents scientific studies cited in the Complaint, including by omitting, *inter alia*, the United States Food & Drug Administration's ("FDA") findings that (1) the relevant scientific evidence does not demonstrate that talc use in the perineal area causes cancer and (2) the FDA's own tests of J&J body powders revealed *no* asbestos.

1

As this Court is well aware, the substantive allegations regarding J&J's talc are being litigated in multiple courts. *See, e.g., In Re: J&J Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 16-2738 (FLW) (D.N.J.).  This case is not the forum to assess the science or underlying claims about J&J's talc.  Here, the issue is whether Plaintiff may proceed with this shareholder derivative suit despite failing to make a demand on J&J's Board of Directors.  For multiple reasons, he may not, and the Complaint should be dismissed.

First, the Complaint should be dismissed because Plaintiff did not make a demand on J&J's Board prior to filing suit.  From 2013 to 2017, New Jersey law required that a shareholder make a demand on a corporation to take suitable action before proceeding with a derivative claim, provided the corporation opted in to that statutory provision in its certificate of incorporation.  N.J.S.A. 14A:3-6.3.  Effective January 2018, the statute was amended to make pre-suit demand mandatory for *all* New Jersey corporations, unless the corporation opted out.  N.J.S.A. 14A:3-6.9.  Plaintiff filed suit after the January 2018 amendment was enacted, Plaintiff has not made a demand on J&J's Board (Compl. ¶ 99), and J&J has not opted out of the statute.  Demand was required here, and Plaintiff's failure to make it requires dismissal of his Complaint.

Additionally, even if demand were not required by statute, the Complaint should be dismissed because Plaintiff fails to demonstrate that making a demand on J&J's Board would be futile.  Before New Jersey enacted its statutory demand requirement, New Jersey courts and courts applying New Jersey law generally required shareholders to make a pre-suit demand on the board.  A shareholder who failed to make a pre-suit demand could not proceed with a derivative lawsuit absent a particularized demonstration that demand would be futile.

2

The bar for pleading demand futility is high.  To demonstrate that making a demand on J&J's Board would be futile, Plaintiff would have to plead particularized facts showing that a majority of J&J's Board acted in bad faith, knowingly violated the law, or received improper personal benefits.  Plaintiff does not come close to meeting this burden.  None of the directors is alleged to have profited personally from the alleged breaches of fiduciary duty.  Nor has Plaintiff pleaded with particularity that the distinguished businesspeople, scientists, and academics comprising J&J's Board acted in bad faith or knowingly violated the law.

Plaintiff also fails to plead any particularized facts showing that a majority of the Board knew of any alleged misconduct and intentionally did nothing to prevent or stop it.  Plaintiff's allegations against the Board in that regard are not only conclusory, but implausible.  J&J's Board would never intentionally put the well-being of millions of consumers at risk.  Moreover, for Plaintiff's theory to be true, J&J's directors could not have acted alone—they would have had to conspire with the numerous federal and state agencies, independent laboratories, scientists, and universities that have tested J&J's talc over the years and found it free from asbestos, and the FDA administrators who have found a lack of evidence that talc causes ovarian cancer.  It is clear that under the prior demand-futility standard, Plaintiff would not be excused from making a demand upon the Board, and the Complaint should be dismissed for that reason, as well.

## FACTUAL BACKGROUND

J&J, a global healthcare company incorporated in New Jersey, is a holding company with more than 260 subsidiaries conducting business in virtually every country of the world. (Compl. ¶ 15; J&J 2017 Form 10-K (excerpts), attached as Ex. 1 to the Certification of Keith J.

Miller ("Miller Cert.") at 1.)[1]  J&J and its subsidiaries have approximately 134,000 employees worldwide engaged in the research, development, manufacture, and sale of a broad range of healthcare products.  (Miller Cert. Ex. 1 at 1.)  The Company currently has three primary lines of business:  (1) consumer healthcare products; (2) pharmaceutical drugs; and (3) medical devices and diagnostics.  (*Id*.)

J&J is a large, diverse, and successful enterprise.  In the past twenty years, J&J's sales have grown from $22.63 billion to $76.45 billion.  (*Compare* J&J 1997 Form 10-K (excerpts), Miller Cert. Ex. 2 at 26 *with* Miller Cert. Ex. 1 at 68.)  Consumer healthcare products make up a small portion of those sales, comprising only 17.8% of J&J's annual sales in 2017.  (Miller Cert. Ex. 1 at 16.)  Baby care consumer products, the category to which J&J's Baby Powder belongs,[2] comprised only 2.5% of J&J's overall sales in 2017.  (*Id.* at 17.)

J&J's Board is comprised of the following eleven highly accomplished individuals, all of whom are outside directors, except Alex Gorsky, J&J's Chairman and Chief Executive Officer ("CEO").  (Compl. ¶ 16–26; J&J 2018 Proxy Stmt. (excerpts), Miller Cert. Ex. 3 at 11–16.)

- **Mary C. Beckerle, Ph.D.**, has been a director since 2015.  (Compl. ¶ 16.)  Dr. Beckerle has served as CEO and Director of the Huntsman Cancer Institute since 2006, and, in 2009, she was appointed Associate Vice President for Cancer Affairs at the University of Utah, where she also serves as a distinguished professor of biology and oncological sciences.  (Miller Cert. Ex. 3 at 11.)  Dr. Beckerle has served on the National Institute of Health Advisory Committee to the Director, on the Board of Directors of the American Association for Cancer Research, as

---

[1] J&J's public filings with the U.S. Securities and Exchange Commission ("SEC") are available at https://johnson andjohnson.gcs-web.com/financial-information/sec-filings.  The Court may take judicial notice of facts gathered from "sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), which includes documents filed with the SEC.  *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

[2] Johnson's Baby Powder is the only current J&J product referred to in the Complaint.  J&J no longer sells Shower to Shower products.  (Miller Cert. Ex. 2 at 83.)

president of the American Society for Cell Biology, and as the Chair of the American Cancer Society Council for Extramural Grants.  (*Id.*)

- **D. Scott Davis** has been a director since 2014.  (Compl. ¶ 17.)  Mr. Davis served as Chairman and CEO of United Parcel Service, Inc. (UPS) from 2008 to 2014, and as Chairman from 2014 to 2016.  (Miller Cert. Ex. 3 at 12.)  Previously, Mr. Davis held various leadership positions with UPS, including Vice Chairman and Chief Financial Officer.  (*Id.*)  Prior to joining UPS, he was CEO of II Morrow Inc., a developer of general aviation and marine navigation instruments.  (*Id.*)

- **Ian E. L. Davis** has been a director since 2010.  (Compl. ¶ 18.)  Mr. Davis is currently non-executive Chairman of Rolls-Royce Holdings plc.  (Miller Cert. Ex. 3 at 12.)  Mr. Davis retired from McKinsey & Company in 2010 after serving as Chairman and Worldwide Managing Director from 2003 until 2009.  (*Id.*)  In his more than 30 years at McKinsey, he served as a consultant to a range of global organizations across the public, private and not-for-profit sectors.  (*Id.*)

- **Jennifer A. Doudna, Ph.D.,** has been a director since 2018.  (Compl. ¶ 19.)  Dr. Doudna joined the faculty at University of California, Berkeley, as a Professor of Biochemistry & Molecular Biology in 2002.  (Miller Cert. Ex. 3 at 13.)  She directs the Innovative Genomics Institute, holds the Li Ka Shing Chancellor's Professorship in Biomedicine and Health, and is the chair of the Chancellor's Advisory Committee on Biology at UC Berkeley.  (*Id.*)  Dr. Doudna is Principal Investigator at the Doudna Lab at UC Berkeley and has founded and serves on the scientific advisory boards of Caribou Biosciences, Inc. and Intellia Therapeutics, Inc., leading genome engineering companies that use the gene-editing system CRISPR.  (*Id.*)  Dr. Doudna has received numerous scientific awards in biochemistry and genetics.  (*Id.*)

- **Alex Gorsky** has been J&J's CEO and Chairman of the Board of Directors since 2012.  (Compl. ¶ 20.)  Mr. Gorsky began his career at J&J in 1988.  (Miller Cert. Ex. 3 at 13.)  In 2001, Mr. Gorsky was appointed President of Janssen Pharmaceutical Inc., and in 2003 he was named Company Group Chairman of the J&J pharmaceutical business in Europe, the Middle East and Africa.  (*Id.*)  Mr. Gorsky left J&J in 2004 to join Novartis Pharmaceuticals Corporation, returning to J&J in 2008.  (*Id.*)

- **Mark B. McClellan, M.D.,** has been a Director since 2013.  (Compl. ¶ 21.)  Dr. McClellan became the inaugural Director of the Duke-Robert J. Margolis, MD, Center for Health Policy and the Margolis Professor of Business, Medicine and Policy at Duke University in 2016.  (Miller Cert. Ex. 3 at 14.)  He is also a faculty member at Dell Medical School at The University of Texas in Austin.  (*Id.*)  From 2007 to 2015, he served as a Senior Fellow in Economic Studies and as Director of the Initiatives on Value and Innovation in Health Care at the Brookings Institution.  (*Id.*)  Dr. McClellan previously served in various positions in the federal

government, including Administrator of the Centers for Medicare & Medicaid Services and Commissioner of the FDA. (*Id.*)

- **Anne M. Mulcahy** has been a director since 2009 and the Lead Director since 2012. (Compl. ¶ 22.) Ms. Mulcahy retired as Chairman and CEO of the Board of Xerox Corporation in July 2009. (Miller Cert. Ex. 3 at 14.) Prior to serving as CEO, Ms. Mulcahy was President and Chief Operating Officer of Xerox. (*Id.*)

- **William D. Perez** has been a director since 2007. (Compl. ¶ 23.) Mr. Perez served as President and CEO of the Wm. Wrigley Jr. Company from 2006 to 2008. (Miller Cert. Ex. 3 at 15.) Before joining Wrigley, Mr. Perez served as President and CEO of Nike, Inc. (*Id.*) Previously, he spent 34 years with S.C. Johnson & Son, Inc., including eight years as its President and CEO. (*Id.*)

- **Charles Prince** has been a director since 2006. (Compl. ¶ 24.) Mr. Prince served as CEO of Citigroup Inc. from 2003 to 2007 and as Chairman of Citigroup's Board from 2006 to 2007. (Miller Cert. Ex. 3 at 15.)

- **A. Eugene Washington, M.D.,** has been a Director since 2012. (Compl. ¶ 25.) Dr. Washington is currently Duke University's Chancellor for Health Affairs and the President and CEO of the Duke University Health System. (Miller Cert. Ex. 3 at 16.) Previously he was Vice Chancellor of Health Sciences, Dean of the David Geffen School of Medicine at UCLA; CEO of the UCLA Health System, and Distinguished Professor of Gynecology and Health Policy at UCLA. (*Id.*) Prior to his time at UCLA, Dr. Washington served in various academic and executive leadership positions at the University of California, San Francisco, including Chair of the Department of Obstetrics, Gynecology, and Reproductive Sciences, and Executive Vice Chancellor and Provost. (*Id.*)

- **Ronald A. Williams** has been a Director since 2011. (Compl. ¶ 26.) Mr. Williams served as Chairman and CEO of Aetna Inc. from 2006 to 2010, and as Chairman from 2010 until his retirement in 2011. (Miller Cert. Ex. 3 at 16.) He is also an advisor to the private equity firm, Clayton, Dubilier & Rice, LLC. (*Id.*) Mr. Williams served on President Obama's Management Advisory Board from 2011 to 2017, as Chairman of the Council for Affordable Quality Healthcare from 2007 to 2010, and as Vice Chairman of The Business Council from 2008 to 2010. (*Id.*)

## PLAINTIFF'S ALLEGATIONS

Plaintiff broadly alleges that the above eleven J&J directors—all of whom hold, or have held, prominent positions in the healthcare field and this country's largest corporations, and several of whom have devoted their careers to scientific leadership and healthcare policy—have disregarded the health of millions of consumers by permitting J&J to market and sell talc-based

body powders.  (Compl. ¶ 9.)  According to Plaintiff's allegations, research studies demonstrate

an association between perineal talc usage and ovarian cancer, and tests indicate that J&J's talc

contained asbestos or asbestos-like fibers (*id.* ¶¶ 32–44); J&J was aware of this, yet continued to

sell talc-based body powders and promote their safety (*id.* ¶¶ 75–80); and finally, the Director

Defendants were themselves aware of the risk, but failed to adequately supervise J&J or take

appropriate steps to prevent wrongful actions by J&J.  (*Id.* ¶¶ 72–74, 101, 111–113.)

Plaintiff presents a distorted view of the relevant facts and science.  As just one example,

Plaintiff alleges that in 2008 the Cancer Prevention Coalition ("CPC") petitioned the FDA

"request[ing] that the FDA immediately require cosmetic talcum powder products to bear a

prominent warning that frequent perineal talc application increased the risk of ovarian cancer."

(Compl. ¶ 50.)  But Plaintiff's Complaint wholly omits the fact that in 2014, the FDA denied

both the 2008 petition, as well as a similar petition submitted by the CPC in 1994, because the

FDA concluded there was insufficient evidence that talc usage causes ovarian cancer.[3]  (2014

FDA Pet. Denial, Miller Cert. Ex. 4 at 1.)

Moreover, even Plaintiff's version of events does not allege any facts demonstrating that

the Board was informed of warnings or purported red flags.  Instead, Plaintiff appears to allege

that the Director Defendants, each of whom joined the Board *after 2006*, were aware of the

alleged risk of talc based on the following:  communications between J&J scientists and

---

[3] The Court may consider the FDA's denial letter to the CPC for two reasons.  First, the denial letter is a public document, available at https://www.regulations.gov/document?D=FDA-2008-P-0309-0011, "whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also Brod v. Sioux Honey Ass'n Coop.*, 609 F. App'x 415, 416 (9th Cir. 2015) (taking judicial notice of an FDA letter denying a citizen petition).  Second, Plaintiff seeks to "extract[ ] an isolated statement" out of context by mentioning only the fact of the petition in the Complaint, without the FDA's decision; it is precisely for this reason that courts are permitted to consider documents relied upon in the complaint when deciding motions to dismiss.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

"federal officials" in the 1970s and 1980s (*id.* ¶¶ 54–60, 62); J&J's membership in the Cosmetic Toiletry and Fragrance Association's "Talc Interested Party Task Force" in the 1990s (*id.* ¶ 64); a single letter sent to J&J's then-CEO in 1994 (*id.* ¶ 65); a label a mining company placed on "Data Sheets" it provided to J&J (*id.* ¶ 69); communications between that mining company and the FDA that did not involve J&J (*id.* ¶ 68); a state law requiring cosmetic manufacturers to register any products containing talc with the state department of public health (*id.* ¶ 70); an alleged internal funding decision regarding a single researcher (*id.* ¶ 71); and the fact that six of the eleven Director Defendants hold positions on Board committees.  (*Id.* ¶¶ 72–74.)

Finally, Plaintiff alleges that the Director Defendants "even today are repeating the false statements they or their predecessors have made denying the health risks for women from using the Company's talc-based body powders," but the Complaint does not identify any such statements made by any of the ten independent directors.  (*Id.* ¶ 103.)

## PROCEDURAL BACKGROUND

On October 9, 2018, Plaintiff filed this derivative Complaint, admitting that he had not made a demand on J&J's Board.  (*See* Compl. ¶ 99.)  The Complaint alleges that Plaintiff did not make the required demand because, according to Plaintiff, demand would be futile.  (*Id.*)

Several months earlier, however, another shareholder did make a demand on J&J's Board with respect to matters similar to those alleged in the Complaint.  (*See* Decl. of D. Wong Yang ¶ 3.)  In response to that demand letter, the Board retained independent legal counsel, Debra Wong Yang of the law firm of Gibson Dunn & Crutcher, to investigate, review, and analyze the facts and circumstances surrounding the allegations raised in the demand letter, as well as any subsequently received demands or shareholder derivative lawsuits making similar allegations.  (*Id.*)

8

The investigation by Ms. Yang, a former United States Attorney and California state court judge, is ongoing.  (*Id*. ¶ 4.)  Once Ms. Yang completes the investigation, she will recommend to the Board what actions, if any, should be taken.  (*Id*. ¶ 3.)  The Board's retention of independent counsel to conduct an investigation in response to a shareholder demand demonstrates the Company's commitment to responsibly and thoroughly addressing these issues.  If Plaintiff makes a demand on the Board as New Jersey law requires, it will be addressed appropriately.

## ARGUMENT

This shareholder derivative suit should be dismissed for two reasons.

First, to proceed with a derivative suit against a New Jersey corporation, New Jersey law requires that a shareholder must first make written demand upon the corporation to take suitable action.  N.J.S.A. 14A:3-6.3, 6.9.  This requirement is statutory and there are no exceptions.  *Id.* Plaintiff failed to make a demand, which requires dismissal.

Second, Plaintiff's Complaint would not have survived under the demand futility exception that was previously applicable.  Plaintiff alleges that demand should be excused based on research that Plaintiff misrepresents and a list of communications that largely predate the current J&J directors' tenure by several decades, yet pleads no particularized facts demonstrating the current directors knew of them.  Nor does Plaintiff allege that the J&J directors intentionally allowed any (allegedly) unsafe products to be sold to consumers without appropriate warnings.  As discussed in detail below, numerous courts have rejected the type of conclusory allegations Plaintiff makes here regarding the J&J Board's oversight of the sale of talc products.  This Complaint falls far short of the pre-2018 demand futility exception standard and should be dismissed for that reason, as well.

I.     **THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILED TO MAKE A DEMAND, AS REQUIRED UNDER NEW JERSEY LAW.**

A.     **In 2018, New Jersey Made Its Statutory Demand Requirement Mandatory, Unless A Corporation Opts Out, Which J&J Has Not Done.**

J&J is incorporated under New Jersey law (Compl. ¶ 15), and New Jersey law governs whether Plaintiff may maintain this shareholder derivative action.  *Kamen v. Kemper Fin. Servs., Inc*., 500 U.S. 90, 108–09 (1991); *Freedman v. Redstone*, 753 F.3d 416, 424 (3d Cir. 2014).  Under New Jersey law, the business and affairs of a corporation are managed under the direction of its board of directors.  N.J.S.A. 14A:6-1.  New Jersey law provides a "powerful presumption" that directors perform their duties to the corporation in accordance with the business judgment rule, *i.e.*, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.  *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig*., 493 F.3d 393, 402 (3d Cir. 2007) ("*Merck II*") (citation omitted).  One of the most significant responsibilities that rests with the directors of a corporation is "[t]he decision to bring a lawsuit or to refrain from litigating a claim on behalf of the corporation."  *Id*. at 399.

In 2013, New Jersey enacted a statutory demand requirement as part of the New Jersey Business Corporation Act ("NJBCA") that states:

> No shareholder may commence a derivative proceeding until:
>
> (1) a written demand has been made upon the corporation to take suitable action; and
>
> (2) 90 days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

N.J.S.A. 14A:3-6.3.

Like other NJBCA provisions related to derivative shareholder proceedings, this

provision is based on the American Bar Association's Model Business Corporation Act
("MBCA").  *Compare* N.J.S.A. 14A:3-6.3 *with* MBCA § 7.42 (2016 Revision) (*See* MBCA
(2016 Revision), Miller Cert. Ex. 5 at § 7.42).  The Official Comment to the MBCA demand
requirement provision makes clear that it is intended to require demand without exception,
explaining:

> [T]he provision eliminates the time and expense of litigating
> whether demand is required.  Requiring a demand in all cases does
> not impose an onerous burden given the relatively short waiting
> period and that this period may be shortened if irreparable injury to
> the corporation would result by waiting for the expiration of the 90-
> day period.

(Miller Cert. Ex. 5 at 147.)  *See also Kamen*, 500 U.S. at 104 n.8 ("The American Bar
Association's Model Business Corporation Act likewise abolishes the futility exception to
demand.").  Courts interpreting state statutes modeled on the MBCA's demand requirement
have held that the statutes eliminated the demand futility exception.  *See, e.g., Speetjens v.
Malaco Inc.*, 929 So. 2d 303, 309 (Miss. 2006) ("The fact is, Mississippi's written demand
statute does not contain an exception for futility, and unless and until the Legislature decides to
include one, it does not exist."); *McCann v. McCann*, 61 P.3d 585, 593 (Idaho 2002) (same);
*Allen ex rel. Allen & Brock Constr. Co., Inc. v. Ferrera*, 540 S.E.2d 761, 765 (N.C. Ct. App.
2000) (same); *Dunn v. Ceccarelli*, 489 S.E.2d 563, 568 (Ga. Ct. App. 1997) (same).  *See also
Ark. Teacher Ret. Sys. ex rel. Progress Software Corp. v. Alsop*, 2007 WL 7069609, at *8–9 (D.
Mass. Sept. 22, 2007).

  When first enacted, New Jersey's statutory demand requirement (and all other
provisions of the NJBCA that dealt with shareholder derivative proceedings, N.J.S.A. 14A:3-6.1
*et seq.*) applied to a corporation only if the corporation made the provisions applicable in its
certificate of incorporation.  *See* N.J.S.A. 14A:3-6.9 (2013).  But in January 2018, the NJBCA

11

was amended to make the shareholder derivative provisions effective automatically.  In

particular, 14A:3-6.9 of the NJBCA provides that, "in any derivative proceeding or shareholder

class action" against a New Jersey corporation:

> a.      Except for sections [unrelated to the demand requirement],
> which must be expressly made applicable by the corporation's
> certificate of incorporation, the provisions of P.L.2013, c. 42
> (C.14A:3-6.1 et seq.) shall apply to actions brought in state or
> federal court both within and outside of the State of New Jersey;
> and
>
> b.      The provisions of the corporation's certificate of
> incorporation may vary the applicability or effect of the provisions
> of P.L.2013, c. 42 (C.14A:3-6.1 et seq.) on that corporation.

N.J.S.A. 14A:3-6.9.

New Jersey courts have not yet directly addressed the impact of this amendment,[4] but its

meaning and purpose is clear:  the demand requirement applies to all New Jersey corporations

unless they expressly opt out in their certificate of incorporation.  As the Senate Commerce

Committee Statement on the amended provision explained at the time of the amendment:

"[u]nder current law, the derivative proceeding and shareholder class action provisions . . .

apply only if a corporation makes them applicable in its certificate of incorporation," but the

revised 14A:3-6.9 "provides that the following provisions will apply to a corporation unless that

corporation chooses to vary the applicability or effect of the provisions in its certificate of

incorporation," including the provision governing "[t]he actions that must be taken before a

shareholder may commence a derivative proceeding."  N.J.S.A. 14A:3-6.9 (including June 19,

2017 Senate Commerce Committee Statement on Assembly Bill No. 2970-L.2017, c. 362.).

J&J has not opted out of the NJCBA shareholder derivative provisions in its certificate

---

[4] In 2018, the New Jersey Superior Court noted that derivative plaintiffs are "required to issue
demand upon the corporation . . . prior to commencing a derivative suit." *Tully v. Mirz*, 198
A.3d 295, 302 (N.J. Super. Ct. App. Div. 2018) (citing N.J.S.A. 14A:3-6.3).

of incorporation.  (*See* Restated Cert. of Incorp., Miller Cert. Ex. 6.[5])  Thus, the demand

requirement applies, and Plaintiff was required to make a demand on J&J's Board before

commencing this suit.  A claim that demand would be futile is no longer permitted under New

Jersey law.  Accordingly, by failing to make a demand, Plaintiff has failed to comply with New

Jersey law, and the Complaint should be dismissed.

### B.    The Statutory Demand Requirement Is Substantive And Overrides The Procedural Demand-Futility Exception That Courts Previously Recognized.

Prior to New Jersey's enactment of the statutory demand requirement, New Jersey

courts, and federal courts applying New Jersey law, grounded the demand requirement and

futility exception in New Jersey Rule of Court ("NJ Rule") 4:32-3 (formerly 4:32-5), which is

based on Federal Rule of Civil Procedure ("Rule") 23.1.  *See In re PSE&G S'holder Litig.*, 801

A.2d 295, 310 (N.J. 2002) (holding that the inquiry for evaluating demand futility applies to

excuse demand under NJ Rule 4:32-5); *In re Midlantic Corp. S'holder Litig.*, 758 F. Supp. 226,

239 (D.N.J. 1990) (explaining that plaintiffs are required to make a demand pursuant to "Rule

4:32-5, the New Jersey equivalent of Rule 23.1, unless excused from doing so as a matter of

state law," and that the principles for determining whether demand is excused are delineated in

New Jersey common law).  NJ Rule 4:32-3, which is nearly identical to Rule 23.1(b)(3)(B),

requires derivative shareholder complaints to "set forth with particularity the efforts of the

plaintiff to secure from the managing directors . . . such action as is desired, and the reasons for

the failure to obtain such action or the reasons for not making such effort."

---

[5] The Court may take judicial notice of J&J's Certificate of Incorporation, which is available at http://www.investor.jnj.com/gov/cdocument.cfm.  *See Murashko v. Hammer,* 2018 WL 1022575, at *1 n.1 (D.N.J. Feb. 22, 2018) (taking judicial notice of a corporate charter on a motion to dismiss); *Zomolosky v. Kullman*, 70 F. Supp. 3d 595, 607 (D. Del. 2014) (same), *aff'd*, 640 F. App'x 212 (3d Cir. 2016).

The NJCBA's demand requirement, which eliminates the futility exception, overrides this procedural rule.  In *Kamen*, the Supreme Court explained that demand futility is a matter of state substantive law and the scope of the demand requirement is a matter of substance, not procedure.  500 U.S. at 96–97.  The Court held that Rule 23.1 sets forth only the adequacy of federal pleadings, *i.e.*, the requirement for pleading with particularity, but does not "abridge, enlarge, or modify any substantive right," and the requirement for demand and any demand futility exception are defined by the law of the state of incorporation.  *Id.* at 96–97, 108–09. Thus, the futility exception under the procedural NJ Rule 4:32-3 yields to the substantive New Jersey statute requiring that demand be made.  *See State ex rel. Y.S.*, 934 A.2d 1140, 1144 (N.J. Super. Ct. Ch. Div. 2007) (New Jersey limits the rule-making power of its Supreme Court to "practice, procedure, and administration," and dictates that "in areas of substantive law (as opposed to procedural law), court rules must yield to legislation") (citing *Winberry v. Salisbury*, 74 A.2d 406 (N.J. 1950)).[6]  Accordingly, Plaintiff's failure to make a demand requires dismissal of his Complaint.

## II.      THE COMPLAINT ALSO FAILS TO MEET THE PRIOR DEMAND FUTILITY STANDARD.

As discussed, prior to New Jersey's enactment of a statutory demand requirement, a shareholder who wanted to bring derivative claims on behalf of a New Jersey corporation still generally had to make a demand on the board first.  *See PSE&G*, 801 A.2d at 307–08; N.J. R. Ct. 4:32-3; Fed. R. Civ. P. 23.1.  Because a shareholder derivative action intrudes upon the

---

[6] State courts interpreting provisions identical to the NJBCA's demand requirement have held that where the futility exception had been grounded in a procedural rule, the statute requiring demand extinguished the futility exception.  *See, e.g.*, *McCann*, 61 P.3d at 593 (explaining that Idaho's futility exception had originally arisen "by case law under the court rule addressing such actions," but by adopting provisions on shareholder derivative actions as part of the corporations code, the state legislature "inten[ded] to no longer recognize 'futility' as an exception").

powers ordinarily vested in a corporation's board of directors to pursue claims on the corporation's behalf, courts required demand to "provide[] corporate managers with the opportunity to address a shareholder's claims" and, if they disagree with the claims, with "an opportunity to reject the demand and, if necessary, seek early dismissal of the suit." *PSE&G*, 801 A.2d at 307.  If a shareholder failed to make a demand, he or she could bring a claim on the corporation's behalf only if the complaint pleaded with particularity why demand on the board would have been futile.  *Id.* at 310; Fed. R. Civ. P. 23.1.

This particularity requirement was adopted "to halt abuses" by ensuring shareholders would use the courts only as "a last resort."  *In re Prudential Ins. Co. Deriv. Litig*., 659 A.2d 961, 968 (N.J. Super. Ct. Ch. Div. 1995); *see also In re Merck & Co., Inc. Deriv. & ERISA Litig*., 2006 WL 1228595, at *4 (D.N.J. May 5, 2006) ("*Merck I*"), *remanded on other grounds*, 493 F.3d 393 (3d Cir. 2007) ("In light of how shareholder derivative actions may usurp director control, courts have warned of the pitfalls of unchecked shareholder derivative litigation."); *PSE&G*, 801 A.2d at 319 (derivative litigation "may have a negative effect on corporate governance when frivolous lawsuits initiated by opportunistic shareholders are brought . . . [and] [i]f abused, . . . can impede the best interests of the corporation").  The Complaint should also be dismissed because its allegations fail to excuse Plaintiff's failure to make a demand.

## A. Plaintiff Must Plead With Particularity That A Majority Of The Directors Are Interested.

In its seminal *PSE&G* decision, the New Jersey Supreme Court adopted the standard set forth under Delaware law in *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) for pleading demand futility where, like here, a shareholder alleges the board failed to prevent or stop misconduct.  801 A.2d at 309–10; *see also Richardson v. Ulsh*, 2007 WL 2713050, at *10 (D.N.J. Sept. 13, 2007) (applying *Rales* to allegations that directors failed to act "despite

15

obvious 'red flags'").  Under New Jersey's application of the *Rales* standard, demand futility is established only if the complaint pleads particularized facts establishing "a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Kanter v. Barella*, 489 F.3d 170, 177 n.8 (3d Cir. 2007) (quoting *Rales*, 634 A.2d at 934).  Here, the Complaint was filed October 9, 2018 when, as now, J&J's Board was comprised of eleven directors, ten of whom are outside directors.  Thus, Plaintiff can demonstrate demand futility only by pleading with particularity that six of J&J's directors were not independent or disinterested, and thus would not have been able to exercise business judgment in responding to Plaintiff's demand.

Directors are presumed to be disinterested and independent.  *Prudential*, 659 A.2d at 970.  A director's independence is determined by whether the "director's decision is based on the corporate merits of the subject before the board rather than extraneous consideration[s] or influences."  *PSE&G*, 801 A.2d at 314 (quoting *Prudential*, 659 A.2d at 971).  A director is interested if "divided loyalties are present, or where the director stands to receive a personal financial gain . . . not equally shared by the shareholders."  *Id*.  Plaintiff does not allege that any of the ten outside directors are not independent, nor that any director received any financial or other benefit from the alleged misconduct.  The directors are thus not interested on that basis.

Instead, Plaintiff's overarching alleged excuse for not making the required demand is his claim that a majority of the directors purportedly breached their fiduciary duties by permitting J&J to continue to sell talc-based body powders after receiving alleged "red flags" or warnings. (Compl. ¶¶ 101, 109–113.)  Plaintiff then asserts that because the directors failed to act in the face of these alleged warnings, demand on the Board would be futile because the directors

16

"suffer an irreconcilable conflict of interest regarding the prosecution of this action" and are thus interested.[7]  (*Id*. ¶ 104.)  Plaintiff is wrong.

> **B.**     **Plaintiff Also Must Plead With Particularity That A Majority Of The Directors Knowingly Acted Against The Interests Of The Company Or Knowingly Violated The Law.**

Pleading demand futility based on a board's failure to act is a very challenging standard for a derivative plaintiff to meet.  The Delaware Chancery Court has described it as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  It is insufficient to allege, as Plaintiff has done here, "that the directors approved, participated, or acquiesced in a challenged transaction." *Fagin v. Gilmartin*, 432 F.3d 276, 283 (3d Cir. 2005). Rather, derivative plaintiffs bringing such claims must plead with specificity "that the directors were conscious of the fact that they were not doing their jobs" and "that they ignored red flags that should have alerted the [Board] to the problems." *Zomolosky v. Kullman*, 640 F. App'x 212, 217 (3d Cir. 2016) (alteration in original) (internal quotation marks and citation omitted). Such "red flags" must be "of such a nature that we can infer that the directors knew or . . . should have known" that the company was engaged in wrongdoing.  *Id.*  These allegations "must not simply demonstrate an aloof or negligent Board, but nonfeasance that rose to the level

---

[7] Plaintiff alleges that Gorsky is individually named in a related § 10(b) securities action, and therefore "has an irreconcilable conflict of interest regarding the prosecution of this action." (Compl. ¶ 105.)  But Plaintiff does not allege that any of the ten independent directors are defendants in that action.  The allegation is thus irrelevant to the futility analysis, as it does not suggest that a majority of the Board would be so compromised.  *See Johnson v. Glassman*, 950 A.2d 215, 230 (N.J. Super. Ct. App. Div. 2008) (a pending securities class action "does not provide material assistance to plaintiffs, since. . . none of the independent Board members is a defendant in that action"); *In re Johnson & Johnson Deriv. Litig.*, 865 F. Supp. 2d 545, 563 (D.N.J. 2011) (noting that allegations specific to the CEO and Chairman of the Board "are unhelpful to Plaintiffs because they do not suggest that a majority of the Board had that same knowledge").

of egregiousness or bad faith." *Merck II*, 493 F.3d at 404; *see also Johnson & Johnson*, 865 F. Supp. 2d at 558 (describing "[a]llegations of bad faith on the part of the directors" as "central to a successful *Caremark* red-flag pleading"). In other words, "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." *Johnson & Johnson,* 865 F. Supp. 2d at 558–59 (citing *Citigroup*, 964 A.2d at 122).

The requirement that Plaintiff must plead bad faith allegations is further heightened because J&J's Certificate of Incorporation expressly exempts its directors from liability to the full extent of New Jersey law. (*See* Miller Cert. Ex. 6 at ¶ Eighth (exculpation provision).) Thus, J&J's directors are not liable for breaches of the duty of care, but rather only for (a) a breach of a "duty of loyalty" (which requires that the directors knew or believed that they were not acting in the best interests of the corporation in connection with a matter in which they had a material conflict of interest); (b) acting "not in good faith or involving a knowing violation of law;" or (c) conduct "resulting in receipt by such person of an improper personal benefit." N.J.S.A. 14A:2-7(3). *See Kanter v. Barella*, 388 F. Supp. 2d 474, 479 n.9 (D.N.J. 2005); *accord Merck I*, 2006 WL 1228595, at *14.

With such a provision in place, Plaintiff "must provide particularized allegations from which the court can infer the board had knowledge of the allegedly corrupt corporate conduct and either 'knew they were not discharging their fiduciary obligations or that they demonstrated a conscious disregard for their duties.'" *Johnson & Johnson,* 865 F. Supp. 2d at 558–59 (quoting *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 174 (D. Del. 2009)). *Accord Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008). The Complaint comes nowhere close to pleading such

18

allegations.  Instead, Plaintiff offers three sets of non-particularized allegations in an attempt to excuse demand:  (1) the Board allegedly received red flags and thus must have known about the alleged misconduct but nonetheless did nothing to stop it (Compl. ¶¶ 101, 109–113); (2) the directors would be hesitant to take any action that could lead to "admitting wrongdoing" in ongoing talc litigation (*id*. ¶¶ 106, 107); and (3) six of the directors serve on various Board committees, whose responsibilities include overseeing legal and regulatory compliance.  (*Id*. ¶¶ 72–74.)  For the reasons below, these allegations, whether considered individually or collectively, do not excuse demand.

**C.   The Alleged Red Flags Do Not Establish A Substantial Likelihood Of Liability.**

Plaintiff alleges that the Director Defendants face a substantial likelihood of liability associated with J&J's continued sales of talc-based body powder products because they intentionally ignored so-called red flags notifying them of alleged risks associated with talc.  To establish a substantial likelihood of liability on such a theory, the Complaint must allege particularized facts showing that:  the Board knew of the alleged red flag; the Board learned from the red flag that misconduct was occurring; and the Board acted "egregiously" in failing to correct the misconduct.  *See, e.g*., *Zomolosky*, 640 F. App'x at 217; *Merck II*, 493 F.3d at 404; *Johnson & Johnson,* 865 F. Supp. 2d at 558–59.  The Complaint fails to meet this stringent standard at each step.  Plaintiff does not allege that any red flags were in fact communicated to any of the directors and therefore fails to establish that the directors knew about any alleged misconduct and, in bad faith, chose not to address it.  Plaintiff's allegations do not even suffice to demonstrate that there were *any* wrongful actions at the Company in connection with sales of J&J's talc-based body powder products.  Plaintiff thus fails to establish a substantial likelihood of Board liability for any of these allegations.

19

      **1.**       **Plaintiff Does Not Allege That Any Purported "Red Flags" Were Communicated To The Board.**

Plaintiff makes the broad assertion that the Board was "repeatedly informed, over a period of decades, of the presence of asbestos in its talc-based products, as well as [of] numerous, independent studies and other sources demonstrating the increased risk of ovarian cancer in women who use talc-based products." (*Id*. ¶ 101.) Plaintiff alleges that various "red flags"—research studies about asbestos or talc safety, communications about talc involving J&J personnel, and other materials—should have put the Board on notice of alleged wrongdoing by the Company. (Compl. ¶¶ 53–71, 75–80, 101–04, 111–113.) But Plaintiff does not allege *any* instances in which these materials or information went to the Board.[8] Indeed, the Complaint alleges only conduct on the part of "J&J" and its personnel, *not* the Board. (Compl. ¶¶ 53–70.) Such an approach "is simply insufficient under the case law." *Johnson & Johnson*, 865 F. Supp. 2d at 577 (citing *King ex rel. Cephalon Inc. v. Baldino*, 409 F. App'x 535, 538 (3d Cir. 2010) (affirming dismissal of complaint on futility grounds because "[t]he purported 'red flags' that [the plaintiff] cites all involve the *company's* marketing and sales practices" and the plaintiff "does not allege any specific connection between any of those practices and the *board*." (emphasis in original))). *See also In re Merck & Co., Inc. Sec., Deriv. & "Erisa" Litig*., 2008 WL 2788400, at *6–7 (D.N.J. June 17, 2008) ("*Merck III*") (derivative complaint failed to "plead particularized facts regarding the [d]irectors' participation in the alleged wrongdoing, that is, exactly how they were involved in the failure to halt or decrease the promotion and sale of [a drug]").

---

[8] Plaintiff also makes one passing reference to the directors themselves making "false statements." (Compl. ¶ 103.) Plaintiff does not substantiate this conclusory allegation with any examples.

Moreover, most of the alleged "red flags" occurred prior to 2006, which is the earliest year that any of the Director Defendants joined the Board. (*See*, *e.g.*, Compl. ¶¶ 54–60 (1970s and 1980s); ¶¶ 62–63 (1982); ¶¶ 37, 64 (1993); ¶ 65 (1994); ¶ 66 (1997); ¶ 68 (2001).) Such allegations are not relevant to the current directors' likelihood of liability. *See Intel*, 621 F. Supp. at 175 ("[S]ince this [event occurred] roughly 16 years ago and before nine of the twelve current Directors joined the Board, it is difficult to see how this is a 'red flag' that the Directors[] allegedly disregarded at their peril.").

Finally, the few post-2006 alleged "red flags" would not plausibly rise to the level of the Board of such a large corporation (nor do any of them come close to establishing that misconduct was occurring). For example, the Complaint alleges that (1) starting in 2006, one of J&J's talc suppliers began including a label about talc on "Data Sheets" it sent J&J[9] (Compl. ¶ 69); (2) in 2016, J&J registered its baby powder with the California Department of Public Health, pursuant to a California law requiring that cosmetic manufacturers register any products containing talc (*id.* ¶ 70); and (3) in 2017, J&J stopped funding a single researcher involved in testing talc samples[10] (*id.* ¶ 71). None of these allegations involve the Board or issues the

---

[9] "Safety Data Sheets," formerly known as "Material Safety Data Sheets," are a requirement of the United States Department of Labor's Occupational Safety and Health Administration ("OSHA") and the Canadian Centre for Occupational Health and Safety, and are designed to provide guidance on how to work safely with chemical products. They are not intended to provide information for consumer safety. (*See* OSHA Quick Card: Hazard Communication Safety Data Sheets, Miller Cert. Ex. 8, available at https://www.osha.gov/Publications/OSHA 3493QuickCardSafetyDataSheet.pdf, and CCOHS Webpage: Material Safety Data Sheets, Miller Cert. Ex. 9, available at https://www.ccohs.ca/oshanswers/chemicals/whmis_ghs/sds. html.) The Court may take judicial notice of information that is "publicly available on government websites." *Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017).

[10] Plaintiff appears to have invented this allegation. The most generous interpretation is that Plaintiff misread another law firm's complaint regarding trial testimony that was offered in 2017 (which was about alleged underlying events from the early 1970s), and somehow turned that into an allegation here that J&J took the alleged action in 2017. *See*, *e.g.*, *Hall v. Johnson & Johnson, et al.*, Case No. 3:18-cv-01833 (FLW) (D.N.J.), Complaint ¶ 65. The implication of

Board would address.  As the *Caremark* court explained,

> Most of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention. Legally, the board itself will be required only to authorize the most significant corporate acts or transactions: mergers, changes in capital structure, fundamental changes in business, appointment and compensation of the CEO, etc.

*Caremark*, 698 A.2d at 968.  Thus, the Complaint fails to plead "allegations of bad faith" or "a sustained or systematic failure of the board to exercise oversight."  *See Johnson & Johnson,* 865 F. Supp. 2d at 558–59.

### 2. Plaintiff Misrepresents The Research On Perineal Talc Usage Cited In The Complaint And The Need For Any Talc-Product Warning.

Plaintiff also misrepresents the "red flag" studies cited in the Complaint by ignoring subsequent FDA findings that concluded that (1) the scientific evidence does not show that talc use in the perineal area causes cancer and; (2) J&J's body powders do not contain asbestos.

Plaintiff alleges that "epidemiologic studies" starting several decades ago "reported an elevated risk of ovarian cancer associated with genital talc use."  (Compl. ¶¶ 35–36.)  Plaintiff points to a 1993 study by the U.S. National Toxicology Program ("NTP"), which Plaintiff alleges concluded that talc was "a carcinogen, with or without the presence of asbestos-like fibers."  (*Id.* ¶ 37.)  Plaintiff also cites alleged warnings of the risks of perineal talc usage, including a petition the Cancer Prevention Coalition ("CPC") submitted to the FDA in 2008 "request[ing] that the FDA immediately require cosmetic talcum powder products to bear a prominent warning that frequent perineal talc application increased the risk of ovarian cancer."

---

Plaintiff's allegation—that asbestos was found in J&J's talc in 2017 and J&J stopped the research as a result—is completely false.  Moreover, even setting aside that the Company vigorously disputes the substance of the underlying testimony regarding what happened *in the 1970s*, nothing about that testimony indicates that misconduct occurred on the watch of the Director Defendants.

(*Id.* ¶ 50.)  Plaintiff ignores, however, that in 2014, the FDA denied both the 2008 petition, as well as a similar petition submitted by the CPC in 1994, on the basis that there was insufficient evidence that talc usage causes ovarian cancer.  (Miller Cert. Ex. 4 at 1.)  In its denial, the FDA addressed and rejected each of the petitions' three main claims.

First, the CPC petition claimed that "[t]alc may be associated with asbestos."  But the FDA noted that the CPC's data "is almost 40 years old," and explained that the FDA conducted its own study in 2009 of products containing talc and cosmetic-grade raw material talc, including Johnson's Baby Powder and Shower to Shower, and found "no asbestos fibers or structures in any of the samples."  (*Id.* at 2–3.)  (FDA Product Ingredient Webpage: Talc, Miller Cert. Ex. 7, available at https://www.fda.gov/Cosmetics/ProductsIngredients/Ingredients/ucm29 3184.htm.)

Second, the CPC petition claimed that "[t]alc is a carcinogen based on the findings of a 1993 National Toxicology Program study."  The FDA rejected this claim because the FDA concluded that study, which Plaintiff cites in the Complaint, had "serious flaws."  (Miller Cert. Ex. 4 at 3.)  The FDA further noted that experts at an FDA workshop had declared that the study, which exposed only animals to talc, "has no relevance to human risk."  (*Id.* at 4.)  The FDA also reviewed the "relevant toxicity literature" on talc, including materials beyond the studies cited in the petitions, and concluded that the relevant studies did not support the CPC's requested warning label.  (*Id.* at 4.)

Finally, the CPC petition claimed that "[e]pidemiological studies confirm the causal relation between genital application of talc and ovarian cancer."  (*Id.* at 2.)  But the FDA reviewed this claim and concluded the studies were unreliable for numerous reasons, including biases in design, failure to account for selection bias and uncontrolled confounding variables,

and inconsistent results of case-control studies.  (*Id.* at 4.)  The FDA further pointed out that "the results of the Nurses' Health Study, a large prospective cohort study, revealed no overall association with . . . talc use and epithelial ovarian cancer."  (*Id.* at 4–5.)  The Complaint's misrepresentation of these alleged "red flags" cannot establish a substantial likelihood of Board liability.

### D.   The Existence Of Litigation Does Not Establish A Substantial Likelihood Of Liability.

Unable to identify any red flags the Board ignored, Plaintiff conclusorily alleges that the Director Defendants cannot be independent because they would be hesitant to take any action that could lead to "admitting wrongdoing" in ongoing talc litigation.  (Compl. ¶¶ 106, 107.) Plaintiff points to a July 12, 2018 verdict in a Missouri state court case, *Ingham v. Johnson & Johnson et al.*, where a jury found against the Company in a case alleging plaintiffs developed ovarian cancer from using J&J's talc-powder products.  (*Id.* ¶¶ 81–88, 107.)  Plaintiff alleges the *Ingham* verdict shows the jury "concluded that J&J, under the stewardship of the Individual Defendants and their predecessors, intentionally schemed to conceal the fact that its talc-based body powders contained asbestos," and that "the Individual Defendants continue to perpetrate their scheme to this day," so "any demand for an investigation of their own wrongful actions would be futile."  (*Id.* ¶ 107.)

But Plaintiff does not allege that the *Ingham* verdict was based on a finding that the Board was involved in any wrongdoing, or that the Director Defendants continue to engage in any wrongdoing.  (*See id.* ¶¶ 81–88.)  Plaintiff does not allege, for example, that any Director Defendants were named in the suit or that any specific evidence ties them to any wrongdoing. Nor does this verdict indicate any oversight failure by the Board.  The verdict was issued on July 12, 2018, less than three months before Plaintiff filed this suit.  "Courts that have held that

24

a Board failed to act in bad faith, and therefore that the directors faced a substantial likelihood

of personal liability, have relied on much longer periods of time of alleged Board inaction."

*Johnson & Johnson*, 865 F. Supp. at 567 (five months of alleged inaction "does not provide a

sufficient basis for inferring that the directors engaged in the sort egregious, conscious disregard

of their duties").  Moreover, J&J has appealed the verdict and that appeal is pending, and similar

verdicts have been overturned in J&J's favor.  *See, e.g.*, *Coordinated v. Johnson & Johnson*,

No. BC628228, 2017 Cal. Super. LEXIS 8757, at *2–4 (Nov. 17, 2017).

Plaintiff also ignores jury verdicts that have been entered in J&J's favor.  *See*, *e.g.*,

*Rosalind Henry et al. v. Johnson & Johnson et al.*, Case No. L-1748-17 (N.J. Super. Ct., Oct.

11, 2018) (Trial Transcript (excerpts), Miller Cert. Ex. 10 at 3059).  And Plaintiff ignores court

rulings that have stricken experts who rely on the studies Plaintiff cites, and granted summary

judgment for J&J.  *See*, *e.g.*, *Carl v. Johnson & Johnson*, 2016 WL 4580145 (N.J. Super Ct.

Law Div. Sept. 2, 2016).  In sum, nothing about this allegation indicates that demand would be

futile.

## E.   The Directors' Service On Board Committees Does Not Establish A Substantial Likelihood Of Liability.

Plaintiff claims that six Director Defendants were aware of the alleged misconduct, and

therefore face a substantial likelihood of liability, as a result of their service on two board

committees:  (1) the Regulatory, Compliance and Government Affairs Committee; and (2) the

Science, Technology and Sustainability Committee.  (Compl. ¶¶ 72–74.)  But Plaintiff fails to

point to *any* particular information that the Director Defendants allegedly learned during these

committee meetings, let alone any specific facts showing that any director intentionally decided

to allow wrongdoing to continue.

Conclusory allegations of this type have been consistently rejected as insufficient to

excuse demand.  Instead, courts "require Plaintiff[ ] to allege, with particularity, how often the committee and the Board met, who on the committee communicated the corporate misconduct to the Board, and how the Board responded to the information provided to them." *Johnson & Johnson*, 865 F. Supp. 2d at 564.  Without "allegations regarding meeting dates, who was actually present at the meetings, or what subjects were discussed. . . . the Court cannot infer that a majority of the Board knew" about any alleged wrongdoing.  *Id.  Accord Zomolosky*, 640 F. App'x at 219 ("In the absence of any allegation detailing what was specifically presented to the committee concerning the [alleged wrongdoing], the complaint fails to plead knowledge with the requisite particularity."); *In re Chemed Corp., S'holder Deriv. Litig*., 2015 WL 9460118, at *22 (D. Del. Dec. 23, 2015), *report and recommendation adopted sub nom. KBC Asset Mgmt. NV v. McNamara*, 2016 WL 2758256 (D. Del. May 12, 2016).  Plaintiff's allegations based on committee membership are, therefore, unavailing.[11]

\*   \*   \*

In sum, Plaintiff has failed to plead particularized facts showing that this is one of the rare cases where the directors' conduct was so egregious that they face a substantial likelihood of liability that excuses demand.  Accordingly, the Complaint should be dismissed even under the prior New Jersey standard.

## III.   THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE.

Plaintiff's Complaint should be dismissed with prejudice.  New Jersey law requires, without exception, demand to be made prior to proceeding with a shareholder derivative claim.

---

[11] Plaintiff also alleges that J&J's Principles of Corporate Governance dictate that the Board is "well supported by accurate and timely information" and "full and free access to officers and employees of the Company."  (Compl. ¶ 102.)  But corporate governance ideals "are not required by the corporation law and do not define standards of liability." *Johnson & Johnson*, 865 F. Supp. 2d at 559–60 (citing *Brehm v. Eisner*, 746 A.2d 244, 255–56 (Del. 2000)).

N.J.S.A. 14A:3-6.3, 6.9.  Plaintiff cannot remedy this failure to make demand through amendment, and any amended complaint would be futile.

**CONCLUSION**

For the foregoing reasons, nominal defendant J&J respectfully requests that the Court dismiss the Complaint with prejudice.

Dated:  February 20, 2019                    Respectfully Submitted,

Walter C. Carlson                              /s/ Keith J. Miller
Kristen R. Seeger                              Keith J. Miller, Esq.
Christopher Y. Lee                             Robinson Miller LLC
A. Michaela Kabat                              One Newark Center
Sidley Austin LLP                              Newark, New Jersey 07102
One South Dearborn                             (973) 690-5400
Chicago, Illinois 60603                        kmiller@rwmlegal.com
(312) 853-7000

*Attorneys for Nominal Defendant*
*Johnson & Johnson*

27